**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF MICHIGAN**

| | |
|---|---|
| RAINA LAGRAND,<br>*on behalf of herself and all others similarly situated,*<br><br>Plaintiff,<br><br>v.<br><br>TRINITY HEALTH MICHIGAN,<br><br>Defendant. | Case No.<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

## CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff Raina LaGrand by and through her attorneys, for their Complaint against Defendant Trinity Health Michigan ("Trinity Health") alleges and states as follows, based on personal knowledge as to her own acts, and on information and belief as to all other matters, based on the investigation conducted by her counsel:

## NATURE OF THE CASE

1. This is a class action lawsuit arising from Defendant's collection and disclosure of members' and patients' sensitive health information and personal data

to Google without prior written notice and informed consent, through tracking mechanisms embedded in its website, www.trinityhealth.org (the "Website").

2. Trinity Health is a faith-based health care provider with a network of health care centers providing health services throughout the state of Michigan. It operates nine hospitals that serve approximately 800,000 patients across 29 counties. Its health system has approximately 2,300 beds and approximately 5,400 physicians. Trinity Health is a member of Trinity Health Corporation, a national, nonprofit, faith-based health care system.

3. Unbeknownst to Website users, Trinity Health has knowingly implemented tracking technologies such as Google Analytics throughout its Website. When Website visitors research medical conditions, search for doctors or medical specialists, and research treatment locations, Trinity Health allows Google to collect sensitive personal health information, including automated, computer-accessible records of members' medical interests, treatment-seeking behavior, and healthcare service inquiries. Google then utilizes the collected personal data to enhance its advertising technology and potentially target individuals with marketing based on their sensitive health information and website interactions.

4. By embedding Google Analytics in its Website, Trinity Health disclosed Plaintiff's and Class Members' confidential personally identifiable information ("PII") and protected health information ("PHI") (collectively referred

to as "Private Information") to Google without prior and specific informed consent. Trinity Health's conduct constitutes an intentional interception of electronic communications in violation of the Electronic Communications Privacy Act ("ECPA"), 18 U.S.C. § 2511.

5. This unauthorized data collection and disclosure breaches members' reasonable expectations of privacy regarding their protected health information and violates federal and Michigan state law, including: (1) the ECPA, 18 U.S.C. § 2511, which prohibits the intentional interception of electronic communications; (2) common law protections against invasion of privacy; (3) the implied contract between Trinity Health and its patients regarding confidentiality; and (4) unjust enrichment.

6. Through this action, Plaintiff seeks to remedy these harms and bring causes of action to hold Trinity Health accountable for these privacy violations, to obtain appropriate remedies for affected individuals, and to prevent the continued unauthorized disclosure of records containing personal data through the hospital's Website.

## THE PARTIES

7. Plaintiff Raina LaGrand is a natural person and citizen of the State of Michigan, residing in Ypsilanti, Michigan. Plaintiff LaGrand has been a patient of Trinity Health Michigan and a user of its Website since approximately 2015.

8. Defendant Trinity Health Michigan is a domestic nonprofit corporation incorporated in Michigan, with its principal place of business located at 20555 Victor Parkway, Suite 100, Livonia, Wayne County, Michigan. Trinity Health's annual operating revenue exceeds $4 billion, with more than 24,000 employees across Michigan. Trinity Health is a covered entity under the Health Insurance Portability and Accountability Act of 1996 (42 U.S.C. § 1320d and 45 C.F.R. Parts 160, 162, and 164 ("HIPAA")).

## JURISDICTION AND VENUE

9. This Court has federal question jurisdiction under 28 U.S.C. § 1331 because this Complaint alleges violations of the Electronic Communications Privacy Act, 18 U.S.C. § 2511, et seq.

10. This Court has subject matter jurisdiction under 28 U.S.C. § 1332(d) because this case is brought as a class action where the amount in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, there are

more than 100 members in the proposed class, and at least one member of the class is a citizen of a state different from Defendant.

11. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367 because those claims are so related to the federal claims that they form part of the same case or controversy.

12. This Court has personal jurisdiction over Defendant because Trinity Health Michigan is incorporated in Michigan, has its principal place of business in Michigan, and conducts substantial business throughout the state of Michigan and in this District.

13. Venue is proper in this District under 28 U.S.C. § 1391(b)(1) because Defendant maintains its principal place of business in this District and regularly conducts business in this District, including operating healthcare facilities where patients' personal and health information is collected and processed through the Website systems at issue in this lawsuit.

## FACTUAL ALLEGATIONS

### A. *Federal Regulators and State Law Make Clear that the Use of Tracking Technologies to Collect & Divulge Private Information Without Informed Consent is Illegal*

14. The surreptitious collection and divulgence of Private Information is an extremely serious data security and privacy issue.

15. Defendant is a health care entity and thus its disclosure of health and medical communications is tightly regulated. The United States Department of Health and Human Services ("HHS") promulgated "Standards for Privacy of Individually Identifiable Health Information" (also known as the "Privacy Rule") governing how health care providers must safeguard and protect Private Information. Under the Privacy Rule, no health care provider can disclose a person's protected health information to a third party without express written authorization.

16. In recent years, both the Federal Trade Commission ("FTC") and the HHS Office for Civil Rights have reiterated the importance of and necessity for data security and privacy concerning health information.

17. For instance, the FTC has engaged in numerous enforcement actions against companies operating health-related apps or websites.[1]

18. In 2023, the FTC imposed a $1.5 million penalty on GoodRx for violating the FTC Act by sharing its customers' sensitive PHI with advertising companies and platforms, including Facebook, Google and Criteo.[2]

---

[1] *See, e.g.*, *United States v. Easy Healthcare Corp.*, No. 1:23-cv-3107 (N.D. Ill. May 17, 2023); *In the Matter of BetterHelp, Inc.*, No. C-4796 (FTC Mar. 2, 2023); *United States v. GoodRx Holdings, Inc.*, No. 23-cv-460 (N.D. Cal. Feb. 1, 2023); *In the Matter of Flo Health, Inc.*, No. C-4747 (FTC June 17, 2021); *see also* Jill McKeon, *How FTC Enforcement Actions Will Impact Telehealth Data Privacy*, Health IT Security (May 2, 2023), https://healthitsecurity.com/features/how-ftc-enforcement-actions-will-impact-telehealth-data-privacy.

[2] *United States v. GoodRx Holdings, Inc.*, No. 23-cv-460 (N.D. Cal. Feb. 17, 2023),

19. Another FTC enforcement action against online counseling service BetterHelp resolved in a $7.8 million settlement based on allegations that the company shared customer health data with Facebook and Snapchat.[3]

20. Meanwhile, the FTC submitted a stipulated order requiring Easy Healthcare to pay a $100,000 civil penalty for violating the Health Breach Notification Rule when its ovulation tracking app Premon shared health data for advertising purposes.[4]

---

https://www.ftc.gov/legal-library/browse/cases-proceedings/2023090-goodrx-holdings-inc; *see also* Allison Grande, *FTC Targets GoodRx In 1st Action Under Health Breach Rule*, Law360 (Feb. 1, 2023), www.law360.com/articles/1571369/ftc-targets-goodrx-in1st-action-under-health-breach-rule?copied=1 ("The Federal Trade Commission signaled it won't hesitate to wield its full range of enforcement powers when it dinged GoodRx for allegedly sharing sensitive health data with advertisers, teeing up a big year for the agency and boosting efforts to regulate data privacy on a larger scale.").

[3] *In the Matter of BetterHelp, Inc.*, No. C-4796 (FTC July 7, 2023), https://www.ftc.gov/legal-library/browse/cases-proceedings/2023169-betterhelp-inc-matter; *FTC Gives Final Approval to Order Banning BetterHelp from Sharing Sensitive Health Data for Advertising, Requiring It to Pay $7.8 Million*, FTC (July 14, 2023), https://www.ftc.gov/news-events/news/press-releases/2023/07/ftc-gives-final-approval-order-banning-betterhelp-sharing-sensitive-health-data-advertising.

[4] *United States v. Easy Healthcare Corp.*, No. 1:23-cv-3107 (N.D. Ill. June 22, 2023), https://www.ftc.gov/legal-library/browse/cases-proceedings/202-3186-easy-healthcare-corporation-us-v; *Ovulation Tracking App Premom Will be Barred from Sharing Health Data for Advertising Under Proposed FTC Order*, FTC (May 17, 2023), https://www.ftc.gov/news-events/news/press-releases/2023/05/ovulation-tracking-app-premom-will-be-barred-sharing-health-data-advertising-under-proposed-ftc.

21. In July 2023, federal regulators sent a letter to 129 health care providers warning them about using online tracking technologies that could result in unauthorized disclosures of Private Information to third parties. The letter highlighted the "risks and concerns about the use of technologies, such as the Meta/Facebook pixel and Google Analytics, that can track a user's online activities," and warned that "[i]mpermissible disclosures of an individual's personal health information to third parties" could "result in a wide range of harms to an individual or others." According to the letter, "[s]uch disclosures can reveal sensitive information including health conditions, diagnoses, medications, medical treatments, frequency of visits to health care professionals, where an individual seeks medical treatment, and more."[5]

22. Federal regulators also warned that "even if you are not covered by HIPAA, you still have an obligation to protect against impermissible disclosures of personal health information under the FTC Act and the FTC Health Breach Notification Rule."[6]

---

[5] Letter from Melaine Fontes Rainer, Director, Office for Civil Rights, U.S. Dept. of Health and Human Servs. & Samuel Levine, Director, Bureau of Consumer Protection, Federal Trade Comm., to 129 health care providers (July 20, 2023), https://www.hhs.gov/sites/default/files/ocr-ftc-letters-re-use-online-tracking-technologies.pdf.

[6] *Id.*

23. Moreover, the HHS Office for Civil Rights has made clear, in a bulletin titled *Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates*, that the transmission of protected health information violates the Privacy Rule:

> **Regulated entities are not permitted to use tracking technologies in a manner that would result in impermissible disclosures of PHI to tracking technology vendors or any other violations of the HIPAA Rules.** For example, disclosures of PHI to tracking technology vendors for marketing purposes, without individuals' HIPAA-compliant authorizations, would constitute impermissible disclosures.[7]

24. The Bulletin points out the harms that impermissible disclosure of an individual's PHI may cause patients, such as:

> identity theft, financial loss, discrimination, stigma, mental anguish, or other serious negative consequences to the reputation, health, or physical safety of the individual or to others identified in the individual's PHI. Such disclosures can reveal incredibly sensitive information about an individual, including diagnoses, frequency of visits to a therapist or other health care professionals, and where an individual seeks medical treatment.[8]

---

[7] *Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates*, Dept. of Health and Human Services, https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html (footnotes omitted) (vacated in part by *Am. Hosp. Ass'n v. Becerra,* 738 F. Supp. 3d 780 (N.D. Tex. 2024), only to the extent that HIPAA obligations are triggered where online technology connects an IP address with an unauthenticated webpage addressing specific health conditions or healthcare providers).

[8] *Id.*

25. State law likewise prohibits the disclosure of patients' Private Information. The Michigan Public Health Code states that a "patient or resident is entitled to confidential treatment of personal and medical records, and may refuse their release to a person outside the health facility or agency except as required because of a transfer to another health care facility, as required by law or third party payment contract, or as permitted or required under the health insurance portability and accountability act of 1996, Public Law 104-191, or regulations promulgated under that act, 45 CFR parts 160 and 164." MCL 333.20201(2)(c).

**B. *Industry Standards Dictate that Protecting Patient Data and Communications is the Duty of Health Care Companies***

26. A medical provider's duty of confidentiality is a cardinal rule embedded in the physician-patient and hospital-patient relationship.

27. The American Medical Association's ("AMA") Code of Medical Ethics contains numerous rules protecting the privacy of patient data and communications.

28. AMA Code of Ethics Opinion 3.1.1 provides:

> Protecting information gathered in association with the care of the patient is a core value in health care… Patient privacy encompasses a number of aspects, including, … personal data (informational privacy)

29. AMA Code of Medical Ethics Opinion 3.2.4 provides:

> Information gathered and recorded in association with the care of the patient is confidential. Patients are entitled to expect that the sensitive

> personal information they divulge will be used solely to enable their physician to most effectively provide needed services. Disclosing information for commercial purposes without consent undermines trust, violates principles of informed consent and confidentiality, and may harm the integrity of the patient-physician relationship. Physicians who propose to permit third-party access to specific patient information for commercial purposes should: (A) Only provide data that has been de-identified. [and] (b) Fully inform each patient whose record would be involved (or the patient's authorized surrogate when the individual lacks decision-making capacity about the purposes for which access would be granted.

30. AMA Code of Medical Ethics Opinion 3.3.2 provides:

> Information gathered and recorded in association with the care of a patient is confidential, regardless of the form in which it is collected or stored. Physicians who collect or store patient information electronically…must… release patient information only in keeping ethics guidelines for confidentiality.

### C. *Overview of Website Tracking on HealthCare Websites*

31. Some websites employ tracking technologies that collect personal data about users' online activities. These tracking technologies have become increasingly sophisticated, evolving from simple cookies to complex tracking systems that can monitor detailed user behavior across websites and devices.

32. Website tracking technologies typically function by placing small pieces of code on websites that are downloaded to a user's browser when they visit the site. This code enables the collection of various types of data about the user's interactions with the website, which is then transmitted to third-party servers for processing and storage.

33. The most basic form of website tracking involves cookies, which are small text files stored on a user's device that contain information about their browsing activity. First-party cookies are placed by the website the user is visiting directly, while third-party cookies are placed by domains other than the one the user is visiting. These third-party cookies enable tracking across multiple websites and are commonly used for advertising and analytics purposes.

34. JavaScript-based trackers represent a more sophisticated tracking method. Website owners implement these trackers by embedding JavaScript code snippets into their website's source code. When a user loads a webpage containing such code, the tracker is downloaded onto the user's browser, where it activates and collects data about user behavior, which is then transmitted to the tracker provider's servers in real-time.

35. As detailed in this Complaint, Trinity Health has implemented such tracking technologies on their Websites, resulting in the unauthorized disclosure of patients' personal data to Google.

**D. *The Google Analytics Tracking Technology***

36. Google LLC ("Google") is a multinational technology company headquartered in Mountain View, California. Google operates one of the world's largest online advertising platforms, generating over $200 billion in annual revenue primarily through targeted advertising services. Google's business model depends

on collecting vast amounts of user data across its numerous products and services, including Google Search, Gmail, YouTube, and Android, which it then leverages to deliver targeted advertisements.

37. Google Analytics is a web analytics service offered by Google that allows website owners to track visitors' actions on their website in order to gain insights into user behavior and to target them with personalized advertisements. Trinity Health has Google Analytics on its Website.

38. Google Analytics is a JavaScript-based tracking technology developed by Google. Website owners implement Google Analytics by adding a snippet of JavaScript code to their website, typically in the header section of the site's code. This implementation process is usually simple, requiring the website administrator to copy and paste the provided code into the website's source code.

39. Once implemented, Google Analytics loads automatically and immediately whenever a user visits a page containing the tracker's source code. The tracking code executes in the background without any visible indication to the user, making it completely invisible to ordinary website visitors. Only users with technical knowledge who deliberately inspect the page's source code or use specialized browser tools might detect the presence of these tracking mechanisms and the disclosure of information to Google. The surreptitious nature of these

trackers means that users typically have no idea that their personal data is being collected, recorded, and disclosed to third parties like Google.

40. Google Analytics collects various data points about user interactions, which it calls "events" and transmits these details to Google. These events include page views, clicks, form submissions, video plays, file downloads, and custom events defined by the website owner.

41. When users access a website such as Trinity Health's Website while logged into a Google Chrome Browser or logged into their Google Account (such as by logging into their Gmail or YouTube account), Google creates and assigns unique identifiers to website visitors, including through the 3PSID, 3PAPISID, 3PSIDCC, and NID cookies (collectively, the "Cookies"). The 3PSID, 3PAPISID, 3PSIDCC cookies are third-party cookies, and each contains a string of numbers and letters which is unique to each user's Google account, and will be the same on any device or browser that the Google Account holder is logged in to. Google uses these cookies to build a profile of website visitor interests to show relevant and personalized ads through retargeting. The identifiers associated with the 3PSID, 3PAPISID, 3PSIDCC cookies remain constant for approximately 2 years, unless a user manually "clears" their cookies (upon which Google will automatically generate a new, unique identifier associated with each of the cookies.)

42. When creating a Google account, users are required to provide an email address, meaning that data collected alongside the 3PSID, 3PAPISID, and 3PSIDCC cookies (such as user communications on the Trinity Health Website) can be linked by Google to an identifiable email address. Many users also voluntarily provide additional identifying information to Google such as their full name, phone number, home address, work address, profile photograph, and recovery email, either during account creation or while using other Google services. As a result, Google can associate the data collected alongside the cookies not only with an email address, but also with a named and potentially highly personalized user profile. This enables Google to link a user's private activity on a website to their name and broader aspects of their digital identity, particularly when combined with other data collected across Google's ecosystem, such as Gmail usage, YouTube views, or Google Maps history.

43. For users who are not signed into a Google account, Google sets a different type of cookie, known as the NID cookie. The NID cookie is tied to the user's browser rather than to a named account. It still contains a unique identifier that persists for approximately six months, unless a user manually "clears" their cookies (Google will then automatically generate a new, unique identifier associated with the NID cookie). The NID cookie enables Google to track user preferences, browsing behavior, and ad interactions across websites that use Google Analytics

or serve Google Ads. While the NID cookie does not reveal a named account identity, it still allows Google to build behavioral profiles and serve personalized advertisements based on a user's activity, including activity on websites such as HMH's. Google's Privacy Policy expressly acknowledges its practice of tracking users, even when they are not logged in, via sites that have installed the Google Analytics Tracker. Per Google's own statement: "[w]hen you're not signed in to a Google Account, we store the information we collect with unique identifiers tied to the browser, application, or device you're using. This allows us to do things like maintain your preferences across browsing sessions, such as your preferred language or whether to show you more relevant search results or ads based on your activity."[9]

44. Once Google receives, views, reads, and processes the raw user data about "events," which may include personal and sensitive health-related information, it uses the Cookies to associate this data with unique user identifiers, from which it can link website interactions to individual user profiles and track users across multiple different Websites, sessions, and devices when signed into their Google accounts. After the data has been processed and subsequently stored in the

---

[9] *See* Google, *Privacy Policy*, https://policies.google.com/privacy/embedded?hl=en-US (last accessed May 6, 2026).

Google database, Google uses the data to generate reports to help analyze the data collected. Those reports include reports on acquisition (e.g., information about where the traffic originated and the methods by which users arrived at a site), engagement (what web pages and app screens a user visited), and demographics (a user's age, location, language, gender, and interests expressed when browsing online and engaging in purchase activities).

45. In addition to accessing and using the data collected from website users to provide its services, Google also uses the information shared by sites like Trinity Health to maintain and improve Google's own services, develop new services, measure the effectiveness of its advertising, and personalize content and ads that one sees on Google's and its partners' sites and applications. When combined with Google's vast data resources from its other products and services, Google Analytics data can contribute to comprehensive profiles of individuals that can be used for targeting advertisements and other commercial purposes.

**E. *Visitors to Trinity Health's Website Reasonably Expect Their Information to Stay Private***

46. Like most healthcare providers its size, Trinity Health operates a Website that serves as an extension of its healthcare services. The Website lets users and patients search for physicians by name, specialty, location, and other criteria; schedule or request appointments with physicians; access the patient portal

(MyChart); obtain information about medical conditions and treatments; and inquire about financial assistance.

47. Users share personal data that may be identifiable when using these online services, with the reasonable expectation that such information will be kept confidential and used only for legitimate healthcare purposes.

48. Users of the Website reasonably expect that their communications and activities on the Website will remain private, particularly given Trinity Health's status as a healthcare provider subject to HIPAA and other privacy regulations, as well as professional and ethical obligations to protect patient confidentiality.

49. Users would not reasonably expect that simply by visiting Trinity Health's Website to search for doctors, research medical conditions, or explore treatment options, their sensitive health information would be disclosed to third parties like Google for purposes wholly unrelated to healthcare.

**F. *Trinity Health's Implementation of the Google Analytics Tracker***

50. Unbeknownst to Website users, Trinity Health has implemented the Google Analytics Tracker across various pages of its Website, including pages where users input or access sensitive health information.

51. Upon information and belief, the Google Analytics Tracker was implemented on the Website from at least May 2022 and remains active today.

52. By design, the Tracker receives and records the visitor's activities on Trinity Health's website by attaching a particular string of code to communications between the visitor and the website. For example, the Tracker might attach a string of code to a visitor's search for specific words within the website, causing the visitor's search terms to be sent not only to the Website, but also to Google. The Tracker's tracking services are designed to be invisible to Website visitors and can be detected only by delving into the website's underlying source code.

53. The information captured and disclosed to Google through the Tracker constitutes sensitive personal health information and personally identifiable data. Through the collection of the Cookies (which function as persistent unique identifiers) alongside specific healthcare-related website interactions, Google receives sufficient information to identify individual users and connect their sensitive health-seeking behaviors to their digital profiles.

54. Upon information and belief, Google can and does combine this healthcare-related personal data with data from its other services and products, creating detailed profiles that include sensitive personal data and health information linked to identifiable individuals, which can then be used for personalized and targeted advertising.

### G. *Specific Examples of Personal Data Collection and Disclosure on Trinity Health's Website*

55. **Doctor Search Information:** When a user accesses the Trinity Health Website to search for a doctor by clicking the "Find a Doctor" tab, they can search for doctors or filter their search results by specialty, gender, language, provider group, ZIP code, preferred location for care, or by typing text into a search bar. Unbeknownst to users, the user's search criteria and selections are automatically collected and disclosed to Google through the Tracker.

56. **Calls to Doctors from the Website:** Many of the doctors on the Website have their phone numbers listed on their profiles, enabling patients to initiate calls to the doctor to schedule appointments or discuss medical needs. Unbeknownst to users, when a phone number displayed on a doctor's profile is clicked, the Google Analytics Tracker collects this communication and discloses to Google the fact that the user has clicked the phone number along with the name of the doctor and any search criteria entered before reaching the doctor's profile page.

57. **Location Search Information:** When a patient uses the Trinity Health Website to find a treatment location by clicking the "Find a Location" tab, they can search and filter for facilities based on criteria such as facility type, services offered, location, and distance from a ZIP code. Unbeknownst to users, their search criteria

and selections are automatically collected and disclosed to Google through the Tracker.

58. **Medical Service Searches:** When a patient uses the Trinity Health Website to search for specific medical services by clicking the "Find a Service" tab, they can enter conditions or treatments and filter results by specialty. Unbeknownst to users, their searches for specific medical services are automatically collected and disclosed to Google through the Tracker.

59. **General Site Search Queries:** The Trinity Health Website features a general search bar on its homepage that allows patients to search the entire site for specific conditions, treatments, doctors, or services. Unbeknownst to users, the exact text they type into this search bar is collected and disclosed to Google through the Tracker. Search terms like "HIV," "cancer," "pregnancy," or "mental health" directly document a patient's private health concerns in a format maintained by Trinity Health and subsequently disclosed to Google.

60. In each of these examples, the disclosed information reveals sensitive personal data about the patient's potential medical concerns, specific doctors they are interested in seeing, treatments they are researching, or healthcare facilities they wish to visit. All of this personal data is disclosed along with persistent identifiers that can be used to identify individual patients.

**H. *Trinity Health's Responsibility for Google's Data Collection and Disclosure***

61. Although Google's tracking technologies perform the technical functions of collecting and disclosing personal data, Trinity Health bears full legal responsibility for these actions.

62. Trinity Health made the affirmative decision to implement the Google Analytics Tracker on its Website. This implementation was a deliberate action requiring Trinity Health's web administrators to copy Google's tracking code and insert it into the Website's source code. Without Trinity Health's deliberate implementation of this code, Google would have no access to the personal data of Trinity Health's Website visitors.

63. Trinity Health controls which pages of its Website contain the tracking code and could choose to exclude tracking from sensitive pages where healthcare information is accessed or inputted, yet it has chosen to implement tracking across these sensitive areas of its Website.

64. Trinity Health maintains complete control over its Website and has the ability to remove or modify the tracking technologies at any time. Its continued use of these technologies represents an ongoing choice to allow Google to collect personal data from Website visitors.

65. By implementing Google's tracking technologies on its Website, Trinity Health has effectively designated Google as its agent for the collection,

processing, and receipt of Website visitors' personal data. This agency relationship makes Trinity Health responsible for the collection and disclosure activities performed by Google's tracking technologies on Trinity Health's behalf and for Trinity Health's benefit.

66. Trinity Health receives direct benefits from implementing Google's tracking technologies, including detailed analytics about Website usage that inform Trinity Health's business and marketing decisions.

### I. *Trinity Health's Failure to Obtain Prior and Specific Informed Consent*

67. Trinity Health fails to obtain prior, specific, informed and written consent from Website users before collecting and disclosing their personal data to third parties like Google.

68. When a user accesses the Website for the first time, Trinity Health presents users with a banner at the bottom of the page stating that "We use cookies and other tools to enhance your browsing experience on our website, provide us with website traffic analytics, and assist in our marketing efforts." Critically, the banner does not solicit express consent from Website users for the collection and disclosure of their personal data to third parties; it merely puts them on notice that cookies and tracking tools are used.

69. The banner further states that Trinity Health does "not use cookies to store or collect Protected Health Information (PHI) from your medical records,

patient portals, or clinical visits." This statement is misleading. While Trinity Health may not directly extract data from medical records or patient portals through cookies, the Google Analytics Tracker embedded on the Website captures detailed health-related browsing behavior, including searches for specific medical conditions, specialists, and treatment locations, and transmits this information to Google alongside persistent unique identifiers that can be linked to individual users. When such health-seeking behavior is associated with an identifiable individual through the Cookies, it constitutes sensitive personal health information, regardless of whether it originates from a medical record or a patient portal.

70. Healthcare privacy law and industry standards require that healthcare providers obtain informed consent before disclosing patients' personal health information to third parties. The banner notification falls far short of this requirement, as it neither informs users of the specific personal data being collected and disclosed, nor obtains their consent for such disclosure.

**PLAINTIFF'S EXPERIENCE WITH TRINITY HEALTH'S WEBSITE**

71. Plaintiff Raina LaGrand has been a patient of Trinity Health Michigan since approximately 2015 and has used Defendant's Website regularly during that period, including at least four separate occasions in 2025 and as recently as May 2026.

72. Plaintiff LaGrand accessed the Website using both her iPhone mobile device and a laptop computer, spending approximately equal time on each device. When accessing the Website through the laptop browser, Plaintiff LaGrand used Google Chrome.

73. At various times during the relevant time period, Plaintiff LaGrand accessed the Trinity Health Website in order to search for locations, search for doctors and medical professionals (including gynecology specialist Dr. Jennifer O'Neil), search for treatments, schedule and attempt to schedule appointments, check test results, and receive treatment.

74. Unbeknownst to Plaintiff LaGrand, during each of these visits to the Website, Trinity Health had implemented Google Analytics tracking software on the Website to intercept and collect her search terms, clicks, and other interactions with the Website. This information, combined with the Cookies assigned by Google, created identifiable records of her healthcare interests without prior written consent.

75. Plaintiff LaGrand never provided prior and specific informed consent in writing for Trinity Health to collect her communications on the Website or to enable or procure Google to do so.

76. Plaintiff LaGrand had a reasonable expectation that communications with Trinity Health's Website, particularly those involving healthcare and medical

matters, would be private and not intercepted or disclosed to third parties without authorization.

77. As a result of Trinity Health's conduct, Plaintiff LaGrand has suffered harm, including invasion of privacy, loss of the economic value of her personal data, diminished trust in Trinity Health as a healthcare provider, and reluctance to use Trinity Health's Website for healthcare-related purposes in the future.

## **INJURY TO PLAINTIFF AND CLASS MEMBERS**

78. Trinity Health's unauthorized collection and disclosure of Website user communications and their enabling of Google's access to this information has caused actual harm to Plaintiff and Class members in multiple ways.

79. *Invasion of Privacy:* Medical and health-related information about individuals is highly private, and its disclosure can result in significant embarrassment, stigma, and even discrimination. Plaintiff and Class members have suffered an invasion of their privacy through the unauthorized collection and disclosure of their personal data and healthcare-related communications and records. These communications and records included searches for medical specialists, calls to doctors or medical specialists, searches for cancer treatments, and inquiries about medical conditions such as hemorrhoids, miscarriages, or cervical cancer. The disclosure of these communications and records violated

Plaintiff's and Class members' reasonable expectation that their interactions with a healthcare provider would remain private.

80. *Loss of Data Value*: Plaintiff and Class members have been deprived of the economic value of their personal data. Personal data, especially health-related information, can have significant commercial value.

81. In a 2014 article by the Federal Trade Commission, the agency detailed the value of user data, particularly health information, and found that data brokers sell data in sensitive categories for a premium.[10] The Commission subsequently brought a lawsuit against one of the data brokers for selling location data regarding people who visit abortion clinics for approximately $160 for a week's worth of data.[11]

82. For years, data harvesting has been one of the fastest growing industries in the United States. Conservative estimates suggest that internet companies earn hundreds of dollars per American user through the interception and use of personal data.

[10] Data Brokers, A Call For Transparency And Accountability, Federal Trade Commission, (May 2014), https://www.ftc.gov/system/files/documents/reports/data-brokers-call-transparency-accountability-report-federal-trade-commission-may-2014/140527databrokerreport.pdf (last accessed May 6, 2026).

[11] Federal Trade Commission (August 2022), https://www.ftc.gov/news-events/news/press-releases/2022/08/ftc-sues-kochava-selling-data-tracks-people-reproductive-health-clinics-places-worship-other (last accessed May 6, 2026).

83. The value of health data is well-known and has been reported on extensively in the news. For example, a 2017 article by Time Magazine titled "How Your Medical Data Fuels a Hidden Multi-Billion Dollar Industry" described the extensive market for health data and noted that the market for information was both lucrative and a significant risk to privacy.[12]

84. Due to the difficulty in obtaining health information, illegal markets also exist for such personal and sensitive information. NPR reported that health data can be "more expensive than stolen credit card numbers."[13]

85. Further, individuals can sell or monetize their own data if they choose to do so. A host of companies and applications such as Nielsen Data, Killi, DataCoup, and AppOptix offer consumers money in exchange for their personal data.

86. In sum, Plaintiff's and Class members' private and personal data, including their protected information, have a recognized monetary value. Trinity Health's unauthorized collection and disclosure to Google of this sensitive personal data have deprived Plaintiff and Class members of the economic value of their

---

[12] Adam Tanner, Time Magazine (January 2017), https://time.com/4588104/medical-data-industry/ (last accessed May 6, 2026).
[13] Aarti Shahani, *The Black Market For Stolen Health Care Data*, NPR (February 13, 2015), https://www.npr.org/sections/alltechconsidered/2015/02/13/385901377/the-black-market-forstolen-health-care-data (last accessed May 6, 2026).

personal property without proper consideration and has resulted in Trinity Health unjustly enriching itself at the expense of Plaintiff and Class members.

87. *Chilling Effect on Healthcare Communication:* Trinity Health's conduct has undermined patient trust and created a chilling effect on digital healthcare communications. Plaintiff and Class members can no longer confidently use the Websites to seek medical information, locate healthcare providers, research cancer treatments, or manage their healthcare without fear that their activities are being monitored and shared with third parties. This chilling effect may lead to reluctance to seek needed healthcare information or services online, potentially impacting health outcomes, particularly for those seeking sensitive medical care such as cancer treatments.

88. *Risk of Further Disclosure:* Once collected and disclosed to Google, Plaintiff's and Class members' data is beyond their control. This creates an ongoing risk that their sensitive health-related information may be further processed, combined with other data sources, or potentially disclosed to additional third parties, causing continued and future harm. For example, Google may combine the health-related data it receives from Trinity Health with data from its other services (such as Google Search, YouTube, or Gmail) to create detailed user profiles that include sensitive health information.

89. *Statutory Injury:* Independent of the above harms, Trinity Health's violation has caused Plaintiff and Class members to suffer statutory injury, entitling them to the remedies provided by the ECPA, including statutory damages of $10,000 per violation.

## CLASS ACTION ALLEGATIONS

90. Plaintiff brings this action on behalf of herself and on behalf of all other persons similarly situated ("the Class") pursuant to Rules 23(b)(2), 23(b)(3), and 23(c)(4) of the Federal Rules of Civil Procedure.

91. Plaintiff seeks to represent the following class of persons ("Class"):

> All individuals residing in the United States who are, or were, patients of Defendant or any of its affiliates, used the Website and had their Private Information disclosed to a third party without authorization.
>
> Excluded from the Class are: (a) Trinity Health, its officers, directors, affiliates, legal representatives, employees, successors, subsidiaries, and assigns; (b) Google, its officers, directors, affiliates, legal representatives, employees, successors, subsidiaries, and assigns; (c) any governmental entities; (d) the judge(s) to whom this case is assigned, their immediate family members, and staff; and (e) any jurors assigned to this case.

92. Plaintiff reserves the right to modify, change, or expand the Class definition based upon discovery and further investigation.

93. **Numerosity, Fed. R. Civ. P. 23(a)(1):** The Class is so numerous that joinder of all members is impracticable. Trinity Health operates a major hospital

network, with approximately 800,000 patients and approximately 2,300 beds across Michigan. On information and belief, the Website receives thousands of unique visitors each month, many of whom interacted with the Website during the relevant time period and had their personal data collected and disclosed to Google.

94. **Commonality and Predominance, Fed. R. Civ. P. 23(a)(2) and (b)(3):** Questions of law and fact common to the Class exist and predominate over any questions affecting only individual Class Members. These common questions include whether Trinity Health implemented the Google Analytics Tracker on its Website; whether the Tracker collected and disclosed Website users' personal data to Google; whether Trinity Health obtained Website users' prior and specific informed consent in writing; whether Trinity Health's conduct violated the ECPA; whether Trinity Health's disclosure constitutes an invasion of privacy; whether Trinity Health breached its implied contract with Plaintiff and Class Members; whether Trinity Health has been unjustly enriched; and whether Plaintiff and Class Members are entitled to damages and equitable relief.

95. **Typicality, Fed. R. Civ. P. 23(a)(3)**: Plaintiff's claims are typical of the claims of the other members of the Class. Plaintiff and Class Members all visited Trinity Health's Website and had their personal data collected and disclosed to Google without their consent.

96. **Adequacy, Fed. R. Civ. P. 23(a)(4)**: Plaintiff will fairly and adequately protect the interests of the Class. Plaintiff has retained counsel experienced in complex class action litigation, and Plaintiff intends to prosecute this action vigorously. Plaintiff has no interests adverse or antagonistic to those of the Class.

97. **Superiority and Manageability, Fed. R. Civ. P. 23(b)(3):** A class action is superior to all other available methods for the fair and efficient adjudication of this controversy. The damages suffered by many Class Members may be relatively small compared to the burden and expense of individual litigation. Class action treatment will permit the adjudication of relatively modest claims by Class Members who could not individually afford to litigate a complex claim against a large corporation like Trinity Health.

98. **Policies Generally Applicable to the Class, Fed. R. Civ. P. 23(b)(2)**: Defendant has acted or refused to act on grounds generally applicable to the Class as a whole, making final injunctive relief or corresponding declaratory relief appropriate with respect to the Class.

## CAUSES OF ACTION

## COUNT I
## BREACH OF FIDUCIARY DUTY/CONFIDENTIALITY
## (On Behalf of Plaintiff and the Class)

99. Plaintiff incorporates all prior allegations as if fully set forth herein and brings this Count individually and on behalf of the proposed Class.

100. Medical providers have a duty to their patients to keep non-public medical information completely confidential, and to safeguard sensitive personal and medical information. This duty arises from the implied covenant of trust and confidence that is inherent in the physician-patient relationship.

101. Plaintiff and Class Members had reasonable expectations of privacy in their communications exchanged with Defendant, including communications exchanged on Defendant's Websites.

102. In light of the special relationship between Defendant and Plaintiff and Class Members, whereby Defendant became guardians of Plaintiff's and Class Members' Private Information, Defendant became fiduciaries by its undertaking and guardianship of the Private Information, to act primarily for the benefit of its patients, including Plaintiff and Class Members: (1) for the safeguarding of Plaintiff's and Class Members' Private Information; (2) to timely notify Plaintiff and Class Members of disclosure of its Private Information to unauthorized third

parties; and (3) to maintain complete and accurate records of what patient information (and where) Defendant did and do store and disclose.

103. Contrary to its duties as medical providers, and its express and implied promises of confidentiality, Defendant installed Google Analytics on its Website to disclose and transmit to third parties Plaintiff's and Class Members' communications with Defendant, including Private Information and the contents of such information.

104. These disclosures were made for commercial purposes without Plaintiff's or Class Members' knowledge, consent, or authorization, and were unprivileged.

105. The unauthorized disclosures of Plaintiff's and Class Members' Private Information were intentionally caused by Defendant's employees acting within the scope of their employment.

106. Alternatively, the disclosures of Plaintiff's and Class Members' Private Information occurred because of Defendant's negligent hiring or supervision of its employees, its failure to establish adequate policies and procedures to safeguard the confidentiality of patient information, or its failure to train its employees to properly discharge their duties under those policies and procedures.

107. The third party recipient included, but may not be limited to, Google. Such information was received by these third parties in a manner that allowed them to identify Plaintiff and the individual Class Members.

108. Defendant's breaches of the common law implied covenant of trust and confidence are evidenced by its failure to comply with federal and state privacy regulations, including:

a. By failing to ensure the confidentiality and integrity of electronic PHI Defendant created, received, maintained, and transmitted, in violation of 45 C.F.R. § 164.306(a)(1);

b. By failing to protect against any reasonably anticipated uses or disclosures of electronic PHI that are not permitted under the privacy rules regarding individually identifiable health information in violation of 45 C.F.R. § 164.306(a)(3);

c. By failing to ensure compliance with the HIPAA security standard rules by its workforce in violation of 45 C.F.R. § 164.306(a)(4);

d. By failing to obtain satisfactory assurances, including in writing, that its business associates and/or subcontractors would appropriately safeguard Plaintiff's and Class Members PHI;

e. By failing to implement technical policies and procedures for electronic information systems that maintain electronic PHI to allow access only to those persons or software programs that have been granted access rights in violation of 45 C.F.R. § 164.312(a)(1);

f. By failing to implement technical security measures to guard against unauthorized access to electronic protected health information that is being transmitted over an electronic communications network in violation of 45 C.F.R. § 164.312(e)(1);

g. By impermissibly and improperly using and disclosing PHI that is and remains accessible to unauthorized persons in violation of 45 C.F.R. § 164.502, et seq.;

h. By failing to effectively train all members of its workforce (including independent contractors) on the policies and procedures with respect to PHI as necessary and appropriate for the members of its workforce to carry out their functions and to maintain security of PHI in violation of 45 C.F.R. § 164.530(b) and 45 C.F.R. § 164.308(a)(5);

i. By failing to keep Private Information confidential as required by MCL 333.20201; and

j. By otherwise failing to safeguard Plaintiff's and Class Members' Private Information.

109. The harm arising from a breach of provider-patient confidentiality includes mental suffering due to the exposure of private information and erosion of the essential confidential relationship between the health care provider and the patient.

110. As a direct and proximate cause of Defendant's unauthorized disclosures of patient personally identifiable, non-public medical information, and communications, Plaintiff and Class members were damaged by Defendant's breach in that:

a. Sensitive and confidential information that Plaintiff and Class members intended to remain private is no longer private;

b. Plaintiff and Class members face ongoing harassment and embarrassment in the form of unwanted targeted advertisements;

c. Defendant eroded the essential confidential nature of the provider-patient relationship;

d. General damages for invasion of their rights in an amount to be determined by a jury;

e. Nominal damages for each independent violation;

f. Defendant took something of value from Plaintiff and Class Members and derived benefit therefrom without Plaintiff's and Class Members' knowledge or informed consent and without compensation for such data;

g. Plaintiff and Class Members did not get the full value of the medical services for which they paid, which included Defendant's duty to maintain confidentiality;

h. Defendant's actions diminished the value of Plaintiff's and Class Members' Private Information; and

i. Defendant's actions violated the property rights Plaintiff and Class members have in their Private Information.

## COUNT II
## VIOLATIONS OF ELECTRONIC COMMUNICATIONS PRIVACY ACT ("ECPA")
## 18 U.S.C. § 2511(1) *et seq.*
## UNAUTHORIZED INTERCEPTION, USE, AND DISCLOSURE
## (On Behalf of Plaintiff and the Class)

111. Plaintiff incorporates all prior allegations as if fully set forth herein and brings this Count individually and on behalf of the proposed Class.

112. The ECPA prohibits the intentional interception of the content of any electronic communication. 18 U.S.C. § 2511.

113. The ECPA protects both sent and received communications.

114. Plaintiff's and Class Members' interactions with Defendant's Website are electronic communications under the ECPA.

115. By utilizing and embedding the Google Analytics Tracker on its Website, Defendant intentionally intercepted, endeavored to intercept, and procured another person to intercept, the electronic communications of Plaintiff and Class Members, in violation of 18 U.S.C. § 2511(1)(a).

116. Specifically, Defendant intercepted Plaintiff's and Class Members' electronic communications via the Tracker, which tracked, stored, and unlawfully disclosed Plaintiff's and Class Members' Private Information to Google.

117. Defendant intercepted the "contents" of Plaintiff's communications in at least the following forms: (a) the parties to the communications; (b) PII such as patients' Google cookie identifiers, browser fingerprints, and other unique identifiers; (c) the precise text of patient communications about specific medical conditions; (d) the details of information generated when patients searched for doctors, locations, and treatments; (e) the details of information generated when patients requested or made appointments; and (f) the precise dates and times when patients interacted with the Website.

118. Whenever Plaintiff and Class Members interacted with Defendant's Website, Defendant, through the Tracker it embedded and operated on its Website,

contemporaneously and intentionally redirected the contents of Plaintiff's and Class Members' electronic communications while those communications were in transmission, to persons or entities other than an addressee or intended recipient of such communication, including Google.

119. Defendant intentionally used wire or electronic communications to increase its revenues. Defendant specifically used the Tracker to track and utilize Plaintiff's and Class Members' Private Information for its own financial benefit.

120. Defendant was not acting under color of law to intercept Plaintiff's and Class Members' wire or electronic communications.

121. Plaintiff and Class Members did not authorize Defendant to acquire the content of their communications for purposes of disclosure to Google via the Tracker.

122. Any purported consent that Defendant received from Plaintiff and Class Members was not valid.

123. Defendant intentionally intercepted the contents of Plaintiff's and Class Members' electronic communications for the purpose of committing a tortious or criminal act in violation of the Constitution or laws of the United States or of any State, including violations of HIPAA and invasion of privacy.

124. Through the above-described tracking technologies and intercepted communications, this information was used by Google to build profiles of Plaintiff

and Class Members and to target them with particular advertising associated with their specific health conditions.

125. As a result of Defendant's violations of the ECPA, Plaintiff and Class Members are entitled to all damages available under 18 U.S.C. § 2520, including statutory damages of whichever is the greater of $100 a day for each day of violation or $10,000, equitable or declaratory relief, compensatory and punitive damages, and attorney's fees and costs.

## COUNT III
## INTRUSION UPON SECLUSION
## (On Behalf of Plaintiff and the Class)

126. Plaintiff incorporates all prior allegations as if fully set forth herein and brings this Count individually and on behalf of the proposed Class.

127. Michigan recognizes the common law tort of invasion of privacy, including the form known as intrusion upon seclusion. This privacy tort protects against intrusion upon the plaintiff's seclusion or solitude, or into his or her private affairs.

128. Plaintiff and Class Members had a reasonable expectation of privacy in their communications with Trinity Health regarding their healthcare needs, medical conditions, and treatment preferences.

129. Trinity Health intentionally intruded upon the seclusion and private affairs of Plaintiff and Class Members by implementing tracking technologies on its

Website that collected sensitive, personal health information without proper authorization or consent.

130. Trinity Health intentionally intruded upon Plaintiff's and Class Members' seclusion by implementing the Google Analytics Tracker on its Website, enabling the interception of their private communications and their disclosure to Google without their knowledge or consent.

131. Trinity Health's intrusion upon Plaintiff's and Class Members' private communications would be highly offensive to a reasonable person. Internet users have a reasonable expectation that their personally identifiable communications with healthcare providers' websites will remain private, particularly when those communications involve sensitive health-related matters.

132. Trinity Health's intrusion was intentional, as it deliberately implemented the Google Analytics Tracker on its Website to capture user communications for its own business purposes.

133. As a direct and proximate result of Trinity Health's invasion of their privacy, Plaintiff and Class Members have suffered injury, including loss of their reasonable expectation of privacy and diminution in the value of their personal information.

134. Plaintiff and Class Members are entitled to damages, including compensatory and punitive damages, in an amount to be determined at trial.

## COUNT IV
## BREACH OF IMPLIED CONTRACT
## (on behalf of Plaintiff and the Class)

135. Plaintiff incorporates all prior allegations as if fully set forth herein and brings this Count individually and on behalf of the proposed Class.

136. As a condition of utilizing Defendant's Website and receiving services from Defendant's health care facilities and professionals, Plaintiff and Class Members provided their Private Information and compensation for their medical care.

137. When Plaintiff and Class Members provided their Private Information to Defendant, they entered an implied contract pursuant to which Defendant agreed to safeguard and not disclose their Private Information without consent.

138. Plaintiff and Class Members would not have entrusted Defendant with their Private Information in the absence of an implied contract obligating Defendant not to disclose Private Information without consent.

139. Defendant breached these implied contracts by disclosing Plaintiff's and Class Members' Private Information without consent to third parties like Google.

140. As a direct and proximate result of Defendant's breaches of these implied contracts, Plaintiff and Class Members sustained damages, including the loss of the benefit of their bargain and diminution in value of Private Information.

**COUNT V**
**UNJUST ENRICHMENT**
**(On behalf of Plaintiff and the Class)**

141. Plaintiff incorporates the prior allegations as if fully set forth herein and brings this Count individually and on behalf of the proposed Class and pleads this Count in the alternative.

142. Trinity Health has received a benefit from Plaintiff and Class Members through the collection of their valuable personal data via the Google Analytics Tracker.

143. By implementing the Google Analytics Tracker on its Website, Trinity Health has been able to disclose users' personal data to a third party for business purposes, including marketing and advertising, thereby enriching itself at the expense of Plaintiff and Class Members.

144. Trinity Health has retained this personal data under circumstances which make it inequitable to do so without payment of its value to Plaintiff and Class Members.

145. Plaintiff and Class Members have suffered a corresponding detriment, including the loss of the economic value of their personal data and the invasion of their privacy.

146. It would be unjust and inequitable to allow Trinity Health to retain the benefits of its unlawful conduct.

147. Plaintiff and Class Members are entitled to restitution and disgorgement of all profits, benefits, and other compensation obtained by Trinity Health through its wrongful conduct.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, respectfully requests that this Court:

(a) Certify this case as a class action on behalf of the proposed Class, appoint Plaintiff as class representative, and appoint Plaintiff's counsel as class counsel;

(b) Declare that Trinity Health's actions, as described herein, violate the Electronic Communications Privacy Act, 18 U.S.C. § 2511;

(c) Award Plaintiff and the Class compensatory damages in an amount to be determined at trial;

(d) Award Plaintiff and the Class statutory damages as provided by the ECPA, 18 U.S.C. § 2520;

(e) Award Plaintiff and the Class punitive damages;

(f) Award Plaintiff and the Class restitution and disgorgement of all profits, benefits, and other compensation obtained by Trinity Health from its wrongful conduct;

(g) Award injunctive relief requiring Trinity Health to cease collecting and disclosing Website users' communications without proper consent; destroy all user data collected through the Google Analytics Tracker; and implement appropriate safeguards to ensure the protection of Website users' privacy in the future;

(h) Award Plaintiff and the Class pre-judgment and post-judgment interest;

(i) Award Plaintiff and the Class reasonable attorneys' fees and costs, as allowed by law; and

(j) Grant such other and further relief as the Court deems just and proper.

## **JURY DEMAND**

Plaintiff demands a trial by jury on all claims and issues so triable.

.

Respectfully submitted,

Dated: May 15, 2026

_/s/ Nathan J. Fink_
David H. Fink (P28235)
Nathan J. Fink (P75185)
**FINK BRESSACK**
38500 Woodward Avenue, Suite 350
Bloomfield Hills, MI 48304
Tel: (248) 971-2500
dfink@finkbressack.com
nfink@finkbressack.com

Katrina Carroll, Esq.*
Kyle Shamberg, Esq.*
**CARROLL SHAMBERG LLC**
200 N. LaSalle, Suite 1650
Chicago, IL 60601
Tel: (872) 215-6205
katrina@csclassactions.com
kyle@csclassactions.com

Don Bivens*
**DON BIVENS, PLLC**
15169 N. Scottsdale Road, Suite 205
Scottsdale, Arizona 85254
Tel: (602) 762-2661
don@donbivens.com
teresita@donbivens.com

**Application for admission to forthcoming*